UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

# FILED

AUG   6 2007

CLERK, U.S. DISTRICT COURT
WEST. DIST. OF PENNSYLVANIA

DANIEL J. NUSBAUM,                      )
                                        )
                           *Plaintiff,* )
              v.                        )
                                        )
MBFG LIMITED PARTNERSHIP d/b/a          )
MONTEREY BAY FISH GROTTO,               )
                                        )
                          *Defendant.*  )

JURY TRIAL DEMANDED

Civil Action No. 07-1032

## COMPLAINT

AND NOW, pursuant to Rule 3 of the Federal Rules of Civil Procedure,

the Plaintiff, Daniel J. Nusbaum, alleges, on information and belief, as follows:

### I.     JURISDICTION AND VENUE

1.     This Court has jurisdiction over Plaintiff's federal rights of action (Counts

I-II, *infra*) pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101

*et seq.*, and, therefore, 28 U.S.C. § 1331(a).  Plaintiff also asserts state law rights of

action (Counts III-IV, *infra*) pursuant to the Pennsylvania Human Relations Act

("PHRA"), 43 Pa. Cons. Stat. §§ 951 *et seq.*, over which 28 U.S.C. § 1367 confers

jurisdiction.

2.     Plaintiff has complied with all prerequisites (jurisdictional or otherwise)

prior to commencing this action.  (*See* Plaintiff's Notice of Right to Sue, issued by the

United States Equal Employment Opportunity Commission ("EEOC") (annexed hereto as

Exhibit A); Plaintiff's Notice of Rights, issued by the Pennsylvania Human Relations

Commission ("PHRC") (annexed hereto as Exhibit B).)

3.     Venue is proper under 28 U.S.C. § 1391(c).

## II.   JURY TRIAL DEMAND

4.      Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial.

## III.   PARTIES

5.      The Plaintiff, Daniel J. Nusbaum, is an adult Caucasian citizen of the United States of America.  He resides at 265 Parkway Drive, Pittsburgh, Pennsylvania 15228.  His date of birth is March 2, 1981.

6.      The Defendant, MBFG Limited Partnership d/b/a Monterey Bay Fish Grotto ("MBFG"), is an entity organized and existing under the laws of the State of Pennsylvania, with its principal facility located at 1411 Grandview Avenue, Pittsburgh, Pennsylvania 15211.  Said defendant at all times was acting through its agents, servants and/or employees, including (but not limited to) Glenn Hawley, Lisa Hawley, Tracy Nieman, and Christopher Amman.[1]

7.      Defendant is an "employer" within the meaning of the ADA.

## IV.   FACTUAL BACKGROUND

8.      Plaintiff was hired as a food server on June 30, 2005.[2]

9.      MBFG maintains a written policy under which food servers are not permitted to eat during the course of a shift (*i.e.*, while "on the clock").  The only exception to this policy is that a food server may eat if (1) there is less than thirty minutes remaining before the restaurant stops seating, and (2) that server has no guests remaining at his/her assigned tables.

---

[1]      Mr. Amman is no longer employed by the defendant.

[2]      Plaintiff worked for defendant in this same capacity during 2000 and 2001, although that period of employment is not at issue in the instant action.

10.     If a server is found to have violated this policy, he/she will receive a written warning.  A second violation will result in a second written warning.  A third violation results in that server's termination.

11.     Plaintiff has been diagnosed with, and suffers from, Attention Deficit Hyperactivity Disorder (ADHD) and Major Depressive Disorder (MDD).

12.     As applied to Plaintiff, ADHD and MDD are "disabilities" within the meaning of the ADA

13.     Plaintiff was permanently diagnosed with MDD and ADHD in or around April 2005.

14.     As part of a treatment regimen for Plaintiff's disabilities, Plaintiff was prescribed, *inter alia*, a stimulant medication called Desoxyn (methamphetamine hydrochloride), which Plaintiff takes daily in two divided doses.

15.     Like most central nervous system (CNS) stimulant medications, amphetamines have certain known side effects, including, most notably, suppression of one's appetite.  This is precisely the reason why amphetamine medications such as Desoxyn were, prior to being indicated for the treatment of ADHD, originally and primarily utilized to treat morbid obesity in certain individuals.

16.     At all times relevant to this action, Plaintiff's height was only five foot, six inches, and his weight fluctuated between approximately 120 and 140 pounds.

17.     As a consequence of Plaintiff's small stature, Plaintiff's primary care physician, Bernard Steinbacher, M.D., considered it essential to Plaintiff's general physical and mental health that he avoid any loss of weight due to the appetite-suppressive effects of Plaintiff's aforementioned prescription drug treatment regimen.

-3-

18.     To ensure that this goal was met, and particularly because Plaintiff possesses an extremely fast metabolism, Dr. Steinbacher instructed Plaintiff to consume as many calories as possible, whenever Plaintiff felt that he was, with no physical discomfort, able to do so.

19.     Plaintiff, upon hearing these instructions, expressed concerns that he would be unable to follow them while working at MBFG because of its aforementioned policy prohibiting food servers from eating during their shift.  Plaintiff assumed that a note from Dr. Steinbacher to MBFG requesting that this policy be waived in his case would serve to remedy the conflict between his physican's important and specific medical directives and his employer's general policy.

20.     Dr. Steinbacher agreed, and wrote Plaintiff a brief note to give to defendant requesting that Plaintiff be permitted to "take eating breaks as necessary."

21.     However, both Plaintiff and Dr. Steinbacher would soon discover that their eminently reasonable assumptions were mistaken, as the defendant, with a wanton and reckless disregard for Plaintiff's physical and emotional health and well-being, was about to engage in a discriminatory and ill-conceived course of conduct, the sole purpose of which was to cause Plaintiff physical and emotional harm, which Plaintiff did in fact suffer.

22.     In or around mid-September 2005, Plaintiff informed defendant's General Manager, Ms. Tracy Nieman, of his disability and presented her with the aforementioned doctor's note.  Ms. Nieman told Plaintiff at that time that this request would not pose a problem.

-4-

23.     Initially, for a brief period of time, defendant did not impose restrictions on Plaintiff's requested accommodation, although on several occasions members of defendant's management have made negative comments or otherwise indicated their displeasure regarding the same.

24.     However, when Glenn Hawley, defendant's owner, found out about Plaintiff's accommodations, he believed that permitting such an exception would not allow him enough control over his operations.  Moreover, he saw this as an opportunity to force Plaintiff, whom he saw as a "troublemaker," to quit by disregarding Plaintiff's medical needs, thereby making Plaintiff's working conditions exceedingly difficult.

25.     Without even contacting Plaintiff's physician — indeed, without any input from any medical professional or other expert whatsoever — Mr. Hawley decided that defendant would no longer honor Plaintiff's requested accommodation, and he unilaterally created a new policy to be applied to Plaintiff (the "Restrictive Eating Policy").

26.     On or around January 30, 2006, Christopher Amman, defendant's then-Assistant General Manager, summoned Plaintiff to a meeting that also included one of defendant's executive chefs, David Indorato.

27.     Prior to this meeting, Mr. Amman had been instructed by Mr. Hawley to inform Plaintiff that defendant would be changing the accommodation it previously provided to the Restrictive Eating Policy, and to orally inform Plaintiff of the terms of the Restrictive Eating Policy.

28.     The terms of the Restrictive Eating Policy were as follows:

(a)     Plaintiff was permitted to take up to two eight-minute breaks per shift, which could only commence after Plaintiff first located a manager within the restaurant and received permission from that manager to do so.

(b)     Plaintiff was permitted to eat ("scarf down," in Mr. Amman's words) only pre-prepared food that was brought from outside the restaurant, even though employees were permitted to eat certain restaurant food items, such as bread and butter, salads, and soup, for free.  Plaintiff was told that if at any time he did not have pre-prepared food available, he would be sent home and disciplined accordingly (*i.e.*, as a "no show" for his shift).

(c)     Plaintiff was permitted to consume his food only while standing in a location in full view of all employees present in the kitchen — a crowded kitchen corner next to the restaurant's old time clock.

29.     Because of the fast-moving pace of restaurants in general, and MBFG in particular, and because MBFG food servers have a significant number of demands placed upon them at any given time throughout their entirety of their shifts, the Restrictive Eating Policy was virtually useless to Plaintiff, and as such, was utterly unresponsive to his medical issues and needs.

30.     For example, because of the fact that managers are constantly moving throughout different areas of the restaurant, which is very large in size, locating a manager could frequently be a difficult and time-consuming task, and it had, in fact, frequently utilized the time that Plaintiff was able to find to eat pursuant to the Policy's other terms.

-6-

31.     The Policy was grossly inflexible.  It had no exceptions, nor did it account for contingencies of any kind, which ignored the unpredictable nature of each individual shift — and, more importantly, the unpredictable nature of the uncomfortable and permanent side effects with which Plaintiff was attempting to cope.

32.     The Restrictive Eating Policy was unreasonable, and was known or should have been known by defendant to be unreasonable from the time of its creation.  It worked against Plaintiff's ability to eat adequately, preserve his health and well-being, and perform his job duties in a consistently satisfactory manner.

33.     Even while Plaintiff was attempting in good faith to follow the Restrictive Eating Policy, defendant's management conspired to discourage or prevent Plaintiff from doing so.

34.     For instance, on numerous occasions, members of defendant's management would make known to Plaintiff, either verbally or nonverbally, their disapproval when Plaintiff requested one of his allotted breaks.

35.     On or around February 13, 2006, Plaintiff was summoned to a meeting at which Ms. Nieman, Mr. Amman, and Brian DiGianvincenzo[3] were present.

36.     At this meeting, Plaintiff was disciplined for allegedly violating the Restrictive Eating Policy, and was informed that he would be terminated should it happen again.  Plaintiff then attempted to communicate the unreasonable nature of the Policy, specifically because the reality of MBFG's daily operations prevented him from utilizing it either in part or in whole.

---

[3]     Mr. DiGianvincenzo was an Assistant Manager at that time.  He is no longer employed by defendant.

-7-

37.     Mr. Amman made the defendant's discriminatory motives eminently clear when he responded to Plaintiff's concerns by stating to Plaintiff, "We need healthy people here.  If you can't meet that requirement, you need to make a decision [about continuing your employment]."

38.     Defendant's discriminatory conduct and practices continued until Plaintiff was terminated on January 30, 2007.

## V.     CAUSES OF ACTION

### COUNT I

### AMERICANS WITH DISABILITIES ACT, 42 U.S.C. §§ 12101 *et seq.* (DISCRIMINATION BASED ON DISABILITY)

39.     Plaintiff incorporates by reference all allegations contained in Paragraphs 1 through 38 inclusive, as though they were set forth more fully at length herein.

40.     Defendant violated the ADA on a continuing basis by failing to adequately and reasonably accommodate Plaintiff's disability.

41.     Defendant violated the ADA by terminating Plaintiff's employment on account of his disability.

42.     The reasons given by defendant for the termination of Plaintiff's employment were pretextual on account of his disability.

43.     Defendant was motivated, all or in part, by Plaintiff's disability in making its decision to terminate him.

44.     Defendant terminated Plaintiff's employment on account of his seeking an accommodation for his disability.

45.     After requesting an accommodation, Plaintiff was treated less favorably by defendant than other, non-disabled employees similarly situated to him.

-8-

46.     As a direct and proximate result of defendant's actions toward Plaintiff, as described herein, Plaintiff has suffered, and will continue to suffer, severe emotional distress, anxiety, depression and other consequential damages.

47.     The actions taken by defendant as described herein were willful, deliberate, intentional, and outrageous, and were performed with an extreme indifference to the rights of Plaintiff such that an award of punitive damages is warranted.

<u>COUNT II</u>

<u>AMERICANS WITH DISABILITIES ACT, 42 U.S.C. §§ 12101 *et seq.*</u>
<u>(RETALIATION FOR REQUESTING REASONABLE ACCOMMODATION)</u>

48.     Plaintiff incorporates by reference all allegations contained in Paragraphs 1 through 47 inclusive, as though they were set forth more fully at length herein.

49.     As a result of Plaintiff's request for a reasonable accommodation due to his disability and any subsequent actions taken by Plaintiff in furtherance of his rights under federal and state law (including, but not limited to, filing charges of discrimination with the PHRC and EEOC), defendant intentionally retaliated against Plaintiff by subjecting him to constant differential and highly unfavorable treatment vis-à-vis other, similarly situated employees.

50.     Defendant's retaliatory conduct toward Plaintiff violated the ADA.

51.     As a direct and proximate result of defendant's actions, Plaintiff has suffered, and will continue to suffer, severe emotional distress, anxiety, depression and other consequential damages.

52.     The actions taken by defendant were willful, deliberate, intentional, and outrageous, and were performed with an extreme indifference to the rights of Plaintiff such that an award of punitive damages is warranted.

<u>**COUNT III**</u>

<u>**PENNSYLVANIA HUMAN RELATIONS ACT, 43 Pa. Cons. Stat. §§ 951 *et seq.***</u>
<u>**(DISCRIMINATION BASED ON DISABILITY)**</u>

53.     Plaintiff incorporates by reference all allegations contained in Paragraphs 1 through 52 inclusive, as though they were set forth more fully at length herein.

54.     Defendant violated the PHRA on a continuing basis by failing to adequately and reasonably accommodate Plaintiff's disability.

55.     Defendant violated the PHRA by terminating Plaintiff's employment on account of his disability.

56.     The reasons given by defendant for the termination of Plaintiff's employment were pretextual on account of his disability.

57.     Defendant was motivated, all or in part, by Plaintiff's disability in making its decision to terminate him.

58.     Defendant terminated Plaintiff's employment on account of his seeking an accommodation for his disability.

59.     After requesting an accommodation, Plaintiff was treated less favorably by defendant than other, non-disabled employees similarly situated to him.

60.     As a direct and proximate result of defendant's actions toward Plaintiff, as described herein, Plaintiff has suffered, and will continue to suffer, severe emotional distress, anxiety, depression and other consequential damages.

61.     The actions taken by defendant as described herein were willful, deliberate, intentional, and outrageous, and were performed with an extreme indifference to the rights of Plaintiff such that an award of punitive damages is warranted.

-10-

## COUNT IV

## PENNSYLVANIA HUMAN RELATIONS ACT, 43 Pa. Cons. Stat. §§ 951 *et seq.* (RETALIATION FOR REQUESTING REASONABLE ACCOMMODATION)

62.     Plaintiff incorporates by reference all allegations contained in Paragraphs 1 through 61 inclusive, as though they were set forth more fully at length herein.

63.     As a result of Plaintiff's request for a reasonable accommodation due to his disability and any subsequent actions taken by Plaintiff in furtherance of his rights under federal and state law (including, but not limited to, filing charges of discrimination with the PHRC and EEOC), defendant intentionally retaliated against Plaintiff by subjecting him to constant differential and highly unfavorable treatment vis-à-vis other, similarly situated employees.

64.     Defendant's retaliatory conduct toward Plaintiff violated the PHRA.

65.     As a direct and proximate result of defendant's actions, Plaintiff has suffered, and will continue to suffer, severe emotional distress, anxiety, depression and other consequential damages.

66.     The actions taken by defendant were willful, deliberate, intentional, and outrageous, and were performed with an extreme indifference to the rights of Plaintiff such that an award of punitive damages is warranted.

## VI.    RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests judgment in his favor and against defendant, and an award granting him relief including, but not limited to, the following:

      (a)     compensatory and punitive damages;

      (b)     any equitable remedy that this Court considers appropriate under the circumstances;

      (c)     costs, disbursements, and reasonable attorney's fees, should an attorney appear on Plaintiff's behalf during the pendency of this action; and

      (d)     any other and further relief that this Court deems just and proper.

Respectfully submitted,

Daniel J. Nusbaum
265 Parkway Drive
Pittsburgh, Pennsylvania 15228
(917) 567-3168

*Pro Se* Plaintiff

Dated: July 24, 2007

**EXHIBIT A**

EEOC Form 161 (3/98)

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

# DISMISSAL AND NOTICE OF RIGHTS

| To: Daniel J. Nusbaum<br>265 Parkway Drive<br>Pittsburgh, PA 15228 | From: Philadelphia District Office<br>21 South 5th Street<br>Suite 400<br>Philadelphia, PA 19106 |
|---|---|

☐ On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR § 1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 17F-2006-61542 | Maureen T. Pearsall,<br>Investigator | (215) 440-2840 |

## THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans with Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge.

☐ Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

☐ While reasonable efforts were made to locate you, we were not able to do so.

☐ You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged.

☐ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☒ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other (briefly state)

## - NOTICE OF SUIT RIGHTS -
### (See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit must be filed **WITHIN 90 DAYS** of your receipt of this Notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

_Marie M. Tomasso_

Marie M. Tomasso,
District Director

April 26, 2007

(Date Mailed)

Enclosure(s)

cc: MONTEREY BAY FISH GROTTO

Christina L. Kepplinger
Eckert Seamans Cherin & Mellot
U. S. Steel Tower, 600 Grant Street

**EXHIBIT B**

Chairperson
STEPHEN A. GLASSMAN
Vice-Chairperson
RAQUEL OTERO de YIENGST
Secretary
DANIEL D. YUN
Executive Director
HOMER C. FLOYD

COMMONWEALTH OF PENNSYLVANIA
HUMAN RELATIONS COMMISSION
301 Chestnut Street, Suite 300
P.O. Box 3145
Harrisburg, PA 17105-3145
(717) 787-4410 (Voice)
(717) 787-4087 (TTY)

COMMISSIONERS
DAVID A. ALEXANDER
M. JOEL BOLSTEIN
TIMOTHY CUEVAS
REV. DR. JAMES EARL GARMON, SR.
TONI M. GILHOOLEY
J. WHYATT MONDESIRE
KWEILIN NASSAR
DANIEL L. WOODALL, JR.

www.phrc.state.pa.us

July 21, 2006

Daniel J. Nusbaum
265 Parkway Drive
Pittsburgh PA 15228

RE: Daniel J. Nusbaum v Monterey Bay Fish Grotto
Case No. 200504973
EEOC No. 17FA661542

Dear Daniel J. Nusbaum:

The Pennsylvania Human Relations Commission (Commission) has investigated the above referenced complaint of unlawful discrimination and has determined that the complaint should be dismissed because the facts of the case do not establish that probable cause exists to credit the allegations of unlawful discrimination. You have been informed by the investigator of the evidence documented during the investigation and the reasons for the no probable cause dismissal. Enclosed is a Notice of your further rights in this matter.

The Pennsylvania Human Relations Act affords the complainant and the respondent the opportunity for comments after the final disposition of the complaint. If you wish to make written comments regarding the investigation of the complaint please send them to Arberdella White-Davis, the Director of Compliance, at the above address. Your comments will be provided to the Commission members.

Thank you for your cooperation during the course of this investigation.

Very truly yours,

Homer C. Floyd

Homer C. Floyd
Executive Director
HCF: jak

Enclosure
cc: Jennifer Schultz, Esquire