UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

DANIEL J. NUSBAUM,                          )
                                            )
                            *Plaintiff,*    )
                                            )
                    v.                      )      JURY TRIAL DEMANDED
                                            )
MBFG LIMITED PARTNERSHIP d/b/a              )      Civil Action No. 2:07-cv-01032 (NBF)
MONTEREY BAY FISH GROTTO,                   )
                                            )
                            *Defendant.*    )
                                            )

## AMENDED COMPLAINT

AND NOW, pursuant to Rules 3 and 15 of the Federal Rules of Civil

Procedure, the Plaintiff, Daniel J. Nusbaum, alleges, on information and belief, as

follows:

### I.       JURISDICTION AND VENUE

1.       This Court has jurisdiction over Plaintiff's federal rights of action (Counts

I-II, *infra*) pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101

*et seq.*, and, therefore, 28 U.S.C. § 1331(a). Plaintiff also asserts state law rights of

action (Counts III-IV, *infra*) pursuant to the Pennsylvania Human Relations Act

("PHRA"), 43 Pa. Cons. Stat. §§ 951 *et seq.*, over which 28 U.S.C. § 1367 confers

jurisdiction.

2.       Plaintiff has complied with all prerequisites (jurisdictional or otherwise)

prior to commencing this action. (*See* Plaintiff's Notice of Right to Sue, issued by the

United States Equal Employment Opportunity Commission ("EEOC") (annexed hereto as

Exhibit A); Plaintiff's Notice of Rights, issued by the Pennsylvania Human Relations

Commission ("PHRC") (annexed hereto as Exhibit B).)

3.     Venue is proper under 28 U.S.C. § 1391(c).

## II.     JURY TRIAL DEMAND

4.     Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial.

## III.     PARTIES

5.     The Plaintiff, Daniel J. Nusbaum, is an adult Caucasian citizen of the United States of America. He resides at 265 Parkway Drive, Pittsburgh, Pennsylvania 15228. His date of birth is March 2, 1981.

6.     The Defendant, MBFG Limited Partnership d/b/a Monterey Bay Fish Grotto ("MBFG"), is an entity organized and existing under the laws of the State of Pennsylvania, with its principal facility located at 1411 Grandview Avenue, Pittsburgh, Pennsylvania 15211. Said defendant at all times was acting through its agents, servants and/or employees, including (but not limited to) Glenn Hawley, Lisa Hawley, Tracy Nieman, and Christopher Amman.[1]

7.     Defendant is an "employer" within the meaning of the ADA.

## IV.     FACTUAL BACKGROUND

8.     Plaintiff was hired as a food server on June 30, 2005.[2]

9.     MBFG maintains a written policy under which food servers are not permitted to eat during the course of a shift (*i.e.*, while "on the clock"). The only exception to this policy is that a food server may eat if (1) there is less than thirty minutes

---

[1]     Mr. Amman is no longer employed by the defendant.

[2]     Plaintiff worked for defendant in this same capacity during 2000 and 2001, although that period of employment is not at issue in the instant action.

remaining before the restaurant stops seating, and (2) that server has no guests remaining at his/her assigned tables.

10.     If a server is found to have violated this policy, he/she will receive a written warning.  A second violation will result in a second written warning.  A third violation results in that server's termination.

11.     Plaintiff has been diagnosed with, and suffers from, Attention Deficit Hyperactivity Disorder (ADHD) and Major Depressive Disorder (MDD).

12.     As applied to Plaintiff, ADHD and MDD are "disabilities" within the meaning of the ADA

13.     Plaintiff was permanently diagnosed with MDD and ADHD in or around April 2005.

14.     As part of a treatment regimen for Plaintiff's disabilities, Plaintiff was prescribed, *inter alia*, a stimulant medication called Desoxyn (methamphetamine hydrochloride), which Plaintiff takes daily in two divided doses.

15.     Like most central nervous system (CNS) stimulant medications, amphetamines have certain known side effects, including, most notably, suppression of one's appetite.  This is precisely the reason why amphetamine medications such as Desoxyn were, prior to being indicated for the treatment of ADHD, originally and primarily utilized to treat morbid obesity in certain individuals.

16.     At all times relevant to this action, Plaintiff's height was only five foot, six inches, and his weight fluctuated between approximately 120 and 140 pounds.

17.     As a consequence of Plaintiff's small stature, Plaintiff's primary care physician, Bernard Steinbacher, M.D., considered it essential to Plaintiff's general

-3-

physical and mental health that he avoid any loss of weight due to the appetite-suppressive effects of Plaintiff's aforementioned prescription drug treatment regimen.

18.     To ensure that this goal was met, and particularly because Plaintiff possesses an extremely fast metabolism, Dr. Steinbacher instructed Plaintiff to consume as many calories as possible, whenever Plaintiff felt that he was, with no physical discomfort, able to do so.

19.     Plaintiff, upon hearing these instructions, expressed concerns that he would be unable to follow them while working at MBFG because of its aforementioned policy prohibiting food servers from eating during their shift.  Plaintiff assumed that a note from Dr. Steinbacher to MBFG requesting that this policy be waived in his case would serve to remedy the conflict between his physican's important and specific medical directives and his employer's general policy.

20.     Dr. Steinbacher agreed, and wrote Plaintiff a brief note to give to defendant requesting that Plaintiff be permitted to "take eating breaks as necessary."

21.     However, both Plaintiff and Dr. Steinbacher would soon discover that their eminently reasonable assumptions were mistaken, as the defendant, with a wanton and reckless disregard for Plaintiff's physical and emotional health and well-being, was about to engage in a discriminatory and ill-conceived course of conduct, the sole purpose of which was to cause Plaintiff physical and emotional harm, which Plaintiff did in fact suffer.

22.     In or around mid-September 2005, Plaintiff informed defendant's General Manager, Ms. Tracy Nieman, of his disability and presented her with the aforementioned

doctor's note.  Ms. Nieman told Plaintiff at that time that this request would not pose a problem.

23.     Initially, for a brief period of time, defendant did not impose restrictions on Plaintiff's requested accommodation, although on several occasions members of defendant's management have made negative comments or otherwise indicated their displeasure regarding the same.

24.     However, when Glenn Hawley, defendant's owner, found out about Plaintiff's accommodations, he believed that permitting such an exception would not allow him enough control over his operations.  Moreover, he saw this as an opportunity to force Plaintiff, whom he saw as a "troublemaker," to quit by disregarding Plaintiff's medical needs, thereby making Plaintiff's working conditions exceedingly difficult.

25.     Without even contacting Plaintiff's physician — indeed, without any input from any medical professional or other expert whatsoever — Mr. Hawley decided that defendant would no longer honor Plaintiff's requested accommodation, and he unilaterally created a new policy to be applied to Plaintiff (the "Restrictive Eating Policy").

26.     On or around January 30, 2006, Christopher Amman, defendant's then-Assistant General Manager, summoned Plaintiff to a meeting that also included one of defendant's executive chefs, David Indorato.

27.     Prior to this meeting, Mr. Amman had been instructed by Mr. Hawley to inform Plaintiff that defendant would be changing the accommodation it previously provided to the Restrictive Eating Policy, and to orally inform Plaintiff of the terms of the Restrictive Eating Policy.

28.     The terms of the Restrictive Eating Policy were as follows:

(a)     Plaintiff was permitted to take up to two eight-minute breaks per shift, which could only commence after Plaintiff first located a manager within the restaurant and received permission from that manager to do so.

(b)     Plaintiff was permitted to eat ("scarf down," in Mr. Amman's words) only pre-prepared food that was brought from outside the restaurant, even though employees were permitted to eat certain restaurant food items, such as bread and butter, salads, and soup, for free.  Plaintiff was told that if at any time he did not have pre-prepared food available, he would be sent home and disciplined accordingly (*i.e.*, as a "no show" for his shift).

(c)     Plaintiff was permitted to consume his food only while standing in a location in full view of all employees present in the kitchen — a crowded kitchen corner next to the restaurant's old time clock.

29.     Mr. Amman also explicitly stated to Plaintiff that he was instructed by Mr. Hawley to make it clear that the Restrictive Eating Policy was "non-negotiable."

30.     Because of the fast-moving pace of restaurants in general, and MBFG in particular, and because MBFG food servers have a significant number of demands placed upon them at any given time throughout their entirety of their shifts, the Restrictive Eating Policy was virtually useless to Plaintiff, and as such, was utterly unresponsive to his medical issues and needs.

31.     For example, because of the fact that managers are constantly moving throughout different areas of the restaurant, which is very large in size, locating a manager could frequently be a difficult and time-consuming task, and it had, in fact,

frequently utilized the time that Plaintiff was able to find to eat pursuant to the Policy's other terms.

32.     The Policy was grossly inflexible.  It had no exceptions, nor did it account for contingencies of any kind, which ignored the unpredictable nature of each individual shift — and, more importantly, the unpredictable nature of the uncomfortable and permanent side effects with which Plaintiff was attempting to cope.

33.     The Restrictive Eating Policy was an unreasonable accommodation, and was known or should have been known by defendant to be unreasonable from the time of its creation.  It worked against Plaintiff's ability to eat adequately, preserve his health and well-being, and perform his job duties in a consistently satisfactory manner.

34.     Even while Plaintiff was attempting in good faith to follow the Restrictive Eating Policy, defendant's management conspired to discourage or prevent Plaintiff from doing so.

35.     For instance, on numerous occasions, members of defendant's management would make known to Plaintiff, either verbally or nonverbally, their disapproval when Plaintiff requested one of his allotted breaks.

36.     As another example, on multiple occasions, members of defendant's management team would impose even more restrictive and impractical conditions upon Plaintiff, such as requiring that he also locate and inform a second manager prior to taking an allotted break.

37.     On or around February 13, 2006, Plaintiff was summoned to a meeting at which Ms. Nieman, Mr. Amman, and Brian DiGianvincenzo[3] were present.

38.     At this meeting, Plaintiff was disciplined for allegedly violating the Restrictive Eating Policy, and was informed that he would be terminated should it happen again.  Plaintiff then attempted to communicate the unreasonable nature of the Policy, specifically because the reality of MBFG's daily operations prevented him from utilizing it either in part or in whole.

39.     Mr. Amman made the defendant's discriminatory motives eminently clear when he responded to Plaintiff's concerns by stating to Plaintiff, "We need healthy people here.  If you can't meet that requirement, you need to make a decision [about continuing your employment]."

40.     On or around February 15, 2006, in an attempt to address and remedy defendant's discriminatory conduct and protect his employment status, Plaintiff approached the PHRC about filing a charge of discrimination.

41.     Plaintiff submitted his completed PHRC intake questionnaires to the PHRC on or around February 16, 2006.

42.     Plaintiff also provided prompt notice to defendant of his decision to pursue formal charges of discrimination in a letter to defendant dated February 17, 2006. A true and correct copy of this letter is annexed hereto as Exhibit C.

---

[3]     Mr. DiGianvincenzo was an Assistant Manager at that time.  He is no longer employed by defendant.

43.    In this letter, Plaintiff informed defendant that he was filing such charges in order to "protect [his] employment status, prevent further disciplinary action and/or retaliatory conduct regarding this matter, and preserve any rights [he] may possess."

44.    On May 4, 2006, defendant was officially served with Plaintiff's PHRC Complaint, which was cross-filed with the EEOC.

45.    As a result of Plaintiff's request for a reasonable accommodation due to his disability and any and all subsequent actions taken by Plaintiff in furtherance of his rights under federal and state law (including, but not limited to, filing charges of discrimination with the PHRC and EEOC), defendant intentionally retaliated against Plaintiff by subjecting him to a pattern of constant differential and highly unfavorable treatment vis-à-vis other, similarly situated employees.

46.    The aforementioned discriminatory and retaliatory conduct and practices of defendant continued throughout the remainder of Plaintiff's employment, and culminated with defendant's decision to terminate Plaintiff on January 30, 2007.

## V.    CAUSES OF ACTION

### COUNT I

### AMERICANS WITH DISABILITIES ACT, 42 U.S.C. §§ 12101 *et seq.* (DISCRIMINATION BASED ON DISABILITY)

47.    Plaintiff incorporates by reference all allegations contained in Paragraphs 1 through 46 inclusive, as though they were set forth more fully at length herein.

48.    Defendant violated the ADA on a continuing basis by failing to adequately and reasonably accommodate Plaintiff's disability.

49.    Defendant violated the ADA by terminating Plaintiff's employment on account of his disability.

50.    The reasons given by defendant for the termination of Plaintiff's employment were pretextual on account of his disability.

51.    Defendant was motivated, all or in part, by Plaintiff's disability in making its decision to terminate him.

52.    Defendant terminated Plaintiff's employment on account of his seeking an accommodation for his disability.

53.    After requesting an accommodation, Plaintiff was treated less favorably by defendant than other, non-disabled employees similarly situated to him.

54.    As a direct and proximate result of defendant's actions toward Plaintiff, as described herein, Plaintiff has suffered, and will continue to suffer, severe emotional distress, anxiety, depression and other consequential damages.

55.    The actions taken by defendant as described herein were willful, deliberate, intentional, and outrageous, and were performed with an extreme indifference to the rights of Plaintiff such that an award of punitive damages is warranted.

## COUNT II

### AMERICANS WITH DISABILITIES ACT, 42 U.S.C. §§ 12101 *et seq.* (RETALIATION FOR REQUESTING REASONABLE ACCOMMODATION)

56.    Plaintiff incorporates by reference all allegations contained in Paragraphs 1 through 55 inclusive, as though they were set forth more fully at length herein.

57.    As a result of Plaintiff's request for a reasonable accommodation due to his disability and any and all subsequent actions taken by Plaintiff in furtherance of his rights under federal and state law (including, but not limited to, filing charges of discrimination with the PHRC and EEOC), defendant intentionally retaliated against

Plaintiff by subjecting him to a pattern of constant differential and highly unfavorable treatment vis-à-vis other, similarly situated employees.

58.     Defendant's retaliatory conduct toward Plaintiff violated the ADA.

59.     As a direct and proximate result of defendant's actions, Plaintiff has suffered, and will continue to suffer, severe emotional distress, anxiety, depression and other consequential damages.

60.     The actions taken by defendant were willful, deliberate, intentional, and outrageous, and were performed with an extreme indifference to the rights of Plaintiff such that an award of punitive damages is warranted.

## COUNT III

## PENNSYLVANIA HUMAN RELATIONS ACT, 43 Pa. Cons. Stat. §§ 951 *et seq.* (DISCRIMINATION BASED ON DISABILITY)

61.     Plaintiff incorporates by reference all allegations contained in Paragraphs 1 through 60 inclusive, as though they were set forth more fully at length herein.

62.     Defendant violated the PHRA on a continuing basis by failing to adequately and reasonably accommodate Plaintiff's disability.

63.     Defendant violated the PHRA by terminating Plaintiff's employment on account of his disability.

64.     The reasons given by defendant for the termination of Plaintiff's employment were pretextual on account of his disability.

65.     Defendant was motivated, all or in part, by Plaintiff's disability in making its decision to terminate him.

66.     Defendant terminated Plaintiff's employment on account of his seeking an accommodation for his disability.

67.     After requesting an accommodation, Plaintiff was treated less favorably by defendant than other, non-disabled employees similarly situated to him.

68.     As a direct and proximate result of defendant's actions toward Plaintiff, as described herein, Plaintiff has suffered, and will continue to suffer, severe emotional distress, anxiety, depression and other consequential damages.

69.     The actions taken by defendant as described herein were willful, deliberate, intentional, and outrageous, and were performed with an extreme indifference to the rights of Plaintiff such that an award of punitive damages is warranted.

## COUNT IV

## PENNSYLVANIA HUMAN RELATIONS ACT, 43 Pa. Cons. Stat. §§ 951 *et seq.* (RETALIATION FOR REQUESTING REASONABLE ACCOMMODATION)

70.     Plaintiff incorporates by reference all allegations contained in Paragraphs 1 through 69 inclusive, as though they were set forth more fully at length herein.

71.     As a result of Plaintiff's request for a reasonable accommodation due to his disability and any and all subsequent actions taken by Plaintiff in furtherance of his rights under federal and state law (including, but not limited to, filing charges of discrimination with the PHRC and EEOC), defendant intentionally retaliated against Plaintiff by subjecting him to a pattern of constant differential and highly unfavorable treatment vis-à-vis other, similarly situated employees.

72.     Defendant's retaliatory conduct toward Plaintiff violated the PHRA.

73.     As a direct and proximate result of defendant's actions, Plaintiff has suffered, and will continue to suffer, severe emotional distress, anxiety, depression and other consequential damages.

-12-

74.    The actions taken by defendant were willful, deliberate, intentional, and outrageous, and were performed with an extreme indifference to the rights of Plaintiff such that an award of punitive damages is warranted.

## VI.    RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests judgment in his favor and against defendant, and an award granting him relief including, but not limited to, the following:

(a)    compensatory and punitive damages;

(b)    any equitable remedy that this Court considers appropriate under the circumstances, including, but not limited to, reinstatement of Plaintiff's employment;

(c)    costs, disbursements, and reasonable attorney's fees, should an attorney appear on Plaintiff's behalf during the pendency of this action; and

(d)    any other and further relief that this Court deems just and proper.

Respectfully submitted,

Daniel J. Nusbaum
329 Highland Road
Pittsburgh, Pennsylvania 15235
(917) 567-3168

*Pro Se* Plaintiff

Dated: November 19, 2007

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the

foregoing Amended Complaint was served on counsel for the Defendant by first-class

mail at the address listed below on the 19th day of November, 2007.

>
> Christina A. Kepplinger, Esq.
> James H. Norris, Esq.
> Eckert Seamans Cherin & Mellott, LLC
> U.S. Steel Tower
> 600 Grant Street, 44th Floor
> Pittsburgh, Pennsylvania 15219

Daniel J. Nusbaum
*Pro Se* Plaintiff

-14-

**EXHIBIT A**

EEOC Form 161 (3/98)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

# DISMISSAL AND NOTICE OF RIGHTS

To: Daniel J. Nusbaum
265 Parkway Drive
Pittsburgh, PA 15228

From: Philadelphia District Office
21 South 5th Street
Suite 400
Philadelphia, PA 19106

☐ On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR § 1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 17F-2006-61542 | Maureen T. Pearsall, Investigator | (215) 440-2840 |

THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans with Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge.

☐ Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

☐ While reasonable efforts were made to locate you, we were not able to do so.

☐ You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged.

☐ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☒ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other (briefly state)

## - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act: This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit must be filed WITHIN 90 DAYS of your receipt of this Notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

Equal Pay Act (EPA): EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.

On behalf of the Commission

_Marie M. Tomasso_

April 26, 2007

Enclosure(s)

Marie M. Tomasso,
District Director

(Date Mailed)

cc: MONTEREY BAY FISH GROTTO

Christina L. Kepplinger
Eckert Seamans Cherin & Mellot
U. S. Steel Tower, 600 Grant Street

**EXHIBIT B**



Chairperson
**STEPHEN A. GLASSMAN**
Vice-Chairperson
**RAQUEL OTERO de YIENGST**
Secretary
**DANIEL D. YUN**
Executive Director
**HOMER C. FLOYD**

**COMMISSIONERS**
**DAVID A. ALEXANDER**
**M. JOEL BOLSTEIN**
**TIMOTHY CUEVAS**
**REV. DR. JAMES EARL GARMON, SR.**
**TONI M. GILHOOLEY**
**J. WHYATT MONDESIRE**
**KWEILIN NASSAR**
**DANIEL L. WOODALL, JR.**

**COMMONWEALTH OF PENNSYLVANIA**
**HUMAN RELATIONS COMMISSION**
**301 Chestnut Street, Suite 300**
**P.O. Box 3145**
**Harrisburg, PA 17105-3145**
**(717) 787-4410 (Voice)**
**(717) 787-4087 (TTY)**

www.phrc.state.pa.us

July 21, 2006

Daniel J. Nusbaum
265 Parkway Drive
Pittsburgh PA 15228

RE:     Daniel J. Nusbaum v Monterey Bay Fish Grotto
        Case No. 200504973
        EEOC No. 17FA661542

Dear Daniel J. Nusbaum:

The Pennsylvania Human Relations Commission (Commission) has investigated the above referenced complaint of unlawful discrimination and has determined that the complaint should be dismissed because the facts of the case do not establish that probable cause exists to credit the allegations of unlawful discrimination. You have been informed by the investigator of the evidence documented during the investigation and the reasons for the no probable cause dismissal. Enclosed is a Notice of your further rights in this matter.

The Pennsylvania Human Relations Act affords the complainant and the respondent the opportunity for comments after the final disposition of the complaint. If you wish to make written comments regarding the investigation of the complaint please send them to Arberdella White-Davis, the Director of Compliance, at the above address. Your comments will be provided to the Commission members.

Thank you for your cooperation during the course of this investigation.

Very truly yours,

Homer C. Floyd
Executive Director
HCF: jak

Enclosure
cc: Jennifer Schultz, Esquire

**EXHIBIT C**

# DANIEL J. NUSBAUM
### 265 Parkway Drive
### Pittsburgh, Pennsylvania 15228
### (917) 567-3168 (cellular)
### nusbaum@gmail.com

February 17, 2006

<u>Via Facsimile (412-481-4448) and USPS Certified Mail</u>

Glenn Hawley and Lisa Hawley, Proprietors
Monterey Bay Fish Grotto
1411 Grandview Avenue
Pittsburgh, Pennsylvania 15211

Dear Glenn and Lisa:

   I write to you not as an adversary, but as a loyal employee who is deeply troubled about the situation that has evolved regarding your establishment's proposed accommodation of my current medical needs. Please be assured that I will treat any communication between us about this matter with an appropriately strict level of confidentiality, just as I have no doubt that you will do the same.

   Over the past year, I have been diagnosed with two primary psychological disorders, Attention Deficit Hyperactivity Disorder (ADHD) and Major Depressive Disorder (MDD). As a result of these diagnoses, I have been prescribed, among other things, medications such as Adderall (Mixed Salts of a Single-Entity Amphetamine Product) and Desoxyn (Methamphetamine Hydrochloride) that are part of the amphetamine class of stimulants. These powerful and highly controlled substances have, for quite some time, been indicated for the treatment of ADHD as well as other disorders such as narcolepsy, and have been quite successful in improving the mental and physical health and well-being of many individuals who suffer from these disabilities. Amphetamines have also, in some instances, been indicated for the treatment of obesity because of their highly anorectic (*i.e.*, appetite-suppressive) effects.

   While I have undoubtedly benefited immensely from these medications in many ways, almost every medication possesses side effects. Here, the aforementioned anorectic action is one such effect of these medications that is highly negative in its consequences for someone of my physical stature. Indeed, during the period I have been pursuing this course of medication therapy, my weight has dropped from 140 pounds to 124 pounds. Maintaining my weight has been an extremely difficult challenge because of my naturally fast metabolism, highly active occupation, rigorous physical fitness regimen, and, most importantly, my lack of ability to control or predict when or how often my body will be amenable to any kind of caloric intake. Put simply, my appetite

can come and go quickly and for no reason; thus, it is most imperative that I take advantage of any opportunity I can to eat in order to meet my body's caloric needs. My doctor has been quite clear in his instructions, stating that I cannot afford to lose much more weight without incurring potentially serious negative health consequences.

In addition to this weight-related reason, another must be considered that is more immediate in its nature. Consistent with other users of these medications, I may experience a "rebound" effect when the medication begins to wear off. During this period of time, I can, among other things, become sluggish and/or easily agitated due to a concomitant low blood sugar level. Consuming food during this time helps immensely in minimizing the negative effects of any rebound that I might incur. Moreover, not only does it protect me from problems such as lightheadedness or perhaps even something worse, it also makes me more productive and elevates my mood.

One obvious ramification of this difficult reality is that my medical needs directly conflict with Monterey Bay's policy of prohibiting (for the most part) employees from eating while on shift. To be sure, there certainly exist reasonable and understandable bases for this policy; however, these reasons notwithstanding, it would seem that there could be sets of circumstances, such as mine, that would warrant fashioning exceptions to this rule. I am not disputing that you have attempted to do so. Rather, I have taken issue with two things: first, the unilateral process you have employed, in which you have both disregarded wholesale my doctor's professional conclusions, directions, and requests and explicitly refused to consider engaging in formal or informal negotiations of any kind, and second, the substantive policy itself, which is, and will continue to be, ineffective and unreasonable due to, at the very least, its complete lack of flexibility. As you may be aware, your management team has already taken disciplinary action against me for violating this policy, and has explicitly indicated its intention to condition my employment on its acceptance. Given the facts and circumstances surrounding this matter, I strongly believe that this policy is not a "reasonable accommodation" you are required to provide under the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. § 951 et seq., and the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., and is thus unlawfully discriminatory. Consequently, in order to protect my employment status, prevent further disciplinary action and/or retaliatory conduct regarding this matter, and preserve any rights I may possess, I have been forced to file a charge of discrimination with the Pennsylvania Human Relations Commission ("PHRC") and the Equal Employment Opportunity Commission ("EEOC").

Please understand that I have been quite reluctant to take this rather drastic step, because I very much enjoy and take pride in working for your establishment — to the point, in fact, of not even being able to think of seeking employment at another restaurant in the Pittsburgh area. Naturally, I also greatly depend upon the excellent earning potential and generous benefits your establishment provides. However, I feel as though I have been backed against a wall and presented with a most unfair and unsatisfactory ultimatum. Because the law unambiguously provides me relief in precisely these circumstances, I feel that I am left with little choice but to seek assistance

through its enforcement mechanisms. That being said, I still remain open to the possibility of negotiation, and am certainly hopeful that an amicable settlement can be reached between us. Please also understand that as of this time, I am not seeking any kinds of remedies other than my continued employment at Monterey Bay (with no changes to my employment status), the withdrawal from my employment file of any disciplinary action already taken with regard to this matter, and an eating policy that can adequately and reasonably accommodate my individual medical needs.

At this time, I do not wish to recount the series of events that have led to this correspondence. Instead, I will do so in the PHRC complaint. I would like to note, however, that much of the discussion in the meetings where I have been disciplined on this matter has, unfortunately, been fraught with a lack of compassion, understanding, and professionalism on the part of your management team, which I hope can be avoided going forward. Make no mistake about it: contrary to what one of your managers has so thoughtlessly stated, accommodating my disability is absolutely "[y]our problem." However, it is quite fundamentally my problem as well, and it is my sincere hope that we can find a way to work together as colleagues, not as opponents, to solve it.

Very truly yours,

Daniel J. Nusbaum