UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

_____

DANIEL J. NUSBAUM,                      )
                                         )
        *Plaintiff*,              )
v.                                       )   JURY TRIAL DEMANDED
                                         )
MBFG LIMITED PARTNERSHIP d/b/a           )   Civil Action No. 2:07-cv-01032 (NBF)
MONTEREY BAY FISH GROTTO,                )
                                         )
        *Defendant*.             )
_____

## **THIRD AMENDED COMPLAINT**

AND NOW, pursuant to Rules 3 and 15 of the Federal Rules of Civil Procedure, the Plaintiff, Daniel J. Nusbaum, alleges, on information and belief, as follows:

### I.    JURISDICTION AND VENUE

1. This Court has jurisdiction over Plaintiff's federal rights of action (Counts I-II, *infra*) pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, and, therefore, 28 U.S.C. § 1331(a). Plaintiff also asserts state law rights of action (Counts III-IV, *infra*) pursuant to the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. §§ 951 *et seq.*, over which 28 U.S.C. § 1367 confers jurisdiction.

2. Plaintiff has complied with all prerequisites (jurisdictional or otherwise) prior to commencing this action. (*See* April 26, 2007 Notice of Right to Sue, issued by the United States Equal Employment Opportunity Commission ("EEOC") (annexed hereto as Exhibit A); July 21, 2006 Notice of Right to Sue, issued by the Pennsylvania Human Relations Commission ("PHRC") (annexed hereto as Exhibit B).) Moreover, to the extent that any deficiencies might have existed after the commencement of this action relating to Plaintiff's exhaustion of administrative remedies for Counts II and IV (Plaintiff's claims of unlawful retaliation under the

ADA and PHRA, respectively), they have since been properly and fully cured.  (*See* March 4, 2008 Notice of Right to Sue, issued by the EEOC (annexed hereto as Exhibit C); May 28, 2008 Notice of Right to Sue, issued by the PHRC (annexed hereto as exhibit D).)

3. Venue is proper under 28 U.S.C. § 1391(c).

## II. JURY TRIAL DEMAND

4. Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial.

## III. PARTIES

5. The Plaintiff, Daniel J. Nusbaum, is an adult citizen of the United States of America.  He resides at 329 Highland Road, Pittsburgh, Pennsylvania 15235.

6. The defendant, MBFG Limited Partnership d/b/a Monterey Bay Fish Grotto ("MBFG" or "defendant"), is an entity organized and existing under the laws of the State of Pennsylvania, with its principal facility located at 1411 Grandview Avenue, Pittsburgh, Pennsylvania 15211.

7. Defendant at all times was acting through its agents, servants and/or employees, including, but not limited to, Glenn Hawley, Tracy Nieman, Christopher Amman, David Indorato, and Brian DiGianvincenzo.[1]

8. Defendant is an "employer" within the meaning of the ADA.

## IV. FACTUAL BACKGROUND

9. Plaintiff was hired as a Food Server ("server") on June 30, 2005.[2]

---

[1] Ms. Nieman, Mr. Amman, and Mr. DiGianvincenzo are no longer employed by defendant.

[2] Plaintiff had previously worked for the defendant in this same capacity from approximately September 2000 until May 2001.

10.     MBFG maintains a written policy under which servers are not permitted to eat during the course of a shift (*i.e.*, while "on the clock").  The only exception to this policy is that a server may eat if (1) there is less than thirty minutes remaining before the restaurant stops seating, and (2) that server has no guests remaining at his/her assigned tables.

11.     If a manager believes that a server has violated this policy, the server will receive a written warning.  A second such violation will result in a second written warning.  A third such violation results in that server's termination.

12.     Plaintiff has been diagnosed with, and suffers from, a medical condition known as Attention Deficit Hyperactivity Disorder ("ADHD").

13.     As applied to Plaintiff, ADHD is a "disability" within the meaning of the ADA.

14.     Plaintiff was permanently diagnosed with ADHD in or around April 2005.

15.     As part of a comprehensive treatment regimen for Plaintiff's disability, Plaintiff was prescribed several powerful central nervous system stimulant medications, two of which are called Adderall (dextroamphetamine/levoamphetamine) and Desoxyn (methamphetamine).

16.     Like most central nervous system stimulant medications, amphetamines have certain known side effects, including, most notably, suppression of one's appetite.  This is precisely the reason why amphetamine medications such as Adderall and Desoxyn were, prior to being indicated for the treatment of ADHD, originally and primarily utilized to treat morbid obesity in certain individuals.[3]

---

[3] The "add" in "Adderall" is actually intended by its manufacturer to be spelled with capital letters, so that it appears as "ADDerall," more visibly indicating its purpose with the well-known acronym for Attention Deficit Disorder ("ADD").  However, prior to its renaming as Adderall in the mid-1990s, the brand name for this medication was Obetrol (which was intended by its manufacturer to bear resemblance to the word "obesity").

17.     In order for Plaintiff's physicians to figure out the which medication (and dosage) was most effective, a difficult, and oftentimes discouraging, process of trial-and-error was required over the course of several months.  Dr. Alicia Kaplan, Plaintiff's psychiatrist at the time, prescribed Adderall to Plaintiff, and shortly thereafter, Plaintiff (who was only five feet, six inches in height and weighed only about 135 pounds) noticed not only a sharp decrease in his previously large appetite, but also (because he was unable to take in enough calories each day) a significant decrease in his weight.

18.     At all times relevant to this action, Plaintiff's weight fluctuated between approximately 120 and 140 pounds.

19.     As a consequence of Plaintiff's small stature, Plaintiff's primary care physician, Dr. Bernard Steinbacher, became concerned, and considered it absolutely essential to Plaintiff's general physical and mental health that he avoid any further loss of weight due to the appetite-suppressive effects of his medications.

20.     To ensure that this objective was met, and particularly because Dr. Steinbacher knew that Plaintiff possesses an extremely fast metabolism and is easily susceptible to episodes of hypoglycemia (*i.e.*, low blood sugar), he instructed Plaintiff to consume as many calories as possible at any time Plaintiff felt that he was, with no physical discomfort, able to do so.

21.     Upon receiving these instructions, Plaintiff expressed a concern that he would be unable to follow them while working at MBFG because of its aforementioned policy prohibiting servers from eating during their shift.  Plaintiff assumed that a doctor's note from one of his treating physicians to MBFG requesting that this policy be waived for him would serve to remedy the conflict between Dr. Steinbacher's specific medical directives and MBFG's general policy.

22. Dr. Steinbacher agreed, and promptly consulted with Dr. Kaplan, who also expressed her agreement. As a result, Dr. Kaplan wrote Plaintiff a brief note to give to defendant requesting that Plaintiff be permitted to "take eating breaks as necessary." The brief nature of the note reflected the expectations of Dr. Kaplan, Dr. Steinbacher, and Plaintiff that any fair-minded employer (particularly a locally-owned restaurant) would never seek to interfere with the health and well-being of a loyal employee by viewing this relatively small and uncomplicated request as a problem.

23. However, both Plaintiff and his physicians would soon discover that their eminently reasonable assumptions were mistaken, as the defendant, with a wanton and reckless disregard for Plaintiff's physical and emotional health and well-being, was about to engage in a discriminatory and ill-conceived course of conduct, the sole purpose of which was to cause Plaintiff physical and emotional harm, which Plaintiff did in fact suffer.

24. In or around mid-September 2005, Plaintiff informed defendant's General Manager, Ms. Tracy Nieman, of his disability and presented her with the aforementioned doctor's note. Ms. Nieman told Plaintiff at that time that this request "would not pose a problem."

25. Initially, for approximately three months, defendant did not impose any restrictions on Plaintiff's requested accommodation, although on several occasions members of defendant's management made negative comments or nonverbally indicated their displeasure regarding the same.

26. After several months of trying Adderall at higher and higher doses, Plaintiff's ADHD symptoms were still not effectively under control; consequently, in or around January

2006, Dr. Steinbacher prescribed Plaintiff Desoxyn in place of Adderall — which, after finding the right dosage, proved to be extremely effective.

27. Desoxyn is the most potent amphetamine available by prescription; accordingly, its appetite-suppressive effects were even greater for Plaintiff than those with which he was attempting to cope while taking Adderall. Therefore, Dr. Steinbacher emphasized that it was more important than ever for Plaintiff to continue to follow his earlier instructions.

28. Glenn Hawley, defendant's owner, did not become aware of the accommodation defendant provided to Plaintiff until in or around late January 2006.

29. Once Mr. Hawley did learn of it, however, he was furious. He viewed giving in to Plaintiff's request (regardless of its medical necessity) not as a kind act which would ensure that Plaintiff stayed in good health, but rather (quite selfishly) as an affront to his ability to maintain absolute control over every single aspect of his operations.

30. Mr. Hawley also believed that if other employees knew that Plaintiff was granted an exception to MBFG's eating policy, some would think it unfair, and this would lead to a damaging breakdown in employee discipline and morale.

31. Moreover, Mr. Hawley feared that giving in to Plaintiff's medical needs would cause other employees to become aware of their rights under the ADA and PHRA, and he had long counted on being able to take full advantage of their lack of knowledge on this subject (which is consistent with the fact that he never took any steps to communicate this information to them). He was even more bothered by the possibility that it would encourage more of his

employees to exercise those same rights — and to Mr. Hawley, the thought of having to agree to any modification of any of his restaurant's policies was not something he could tolerate.[4]

32. Put simply, Mr. Hawley felt that he was above the law.[5] He considered Plaintiff to be a "troublemaker," and saw Plaintiff's unfortunate situation as a golden opportunity to force Plaintiff to quit by disregarding his medical needs, thereby making his day-to-day working conditions exceedingly difficult.

33. Without even contacting any of Plaintiff's physicians — indeed, without any input from any medical professional or other expert whatsoever — Mr. Hawley decided that defendant would no longer honor Plaintiff's requested accommodation, and he unilaterally created a new policy to be applied to Plaintiff (the "Restrictive Eating Policy").

34. On or around January 30, 2006, Christopher Amman, defendant's then-Assistant General Manager, summoned Plaintiff to a meeting that also included defendant's Executive Chef, David Indorato.

35. Prior to this meeting, Mr. Amman had been instructed by Mr. Hawley to inform Plaintiff that defendant would be changing the accommodation it previously provided to the

---

[4] Indeed, on or around January 27, 2006, Mr. Hawley threatened, in no uncertain terms, to immediately fire Plaintiff for attempting to assist an employee with a learning disability (a Busser who was seeking a promotion to Food Serve) in obtaining an extended Food Server training program — without which he was having a great deal of trouble mastering the large amount of material he was being tested on each day. Plaintiff was also told, among other things, that "MBFG does not discuss other employees' training or promotions with [Plaintiff]" (even though the employee specifically asked Plaintiff to be present in such discussions to advocate on his behalf), and that "[f]ellow employees are not [Plaintiff's] concern." After excising Plaintiff from the situation, Mr. Hawley was able to intimidate and manipulate this young employee into no longer seeking any kind of modified training program. Sadly, the employee, a very loyal and competent worker, ultimately failed to become a Food Server because Mr. Hawley's callous disregard for the law cheated him out of the equal opportunity he was guaranteed by the ADA.

[5] This attitude is quite evident from the comment, made by Mr. Hawley on multiple occasions when responding to certain concerns voiced by his employees during mandatory staff meetings, that "Monterey Bay Fish Grotto is a dictatorship, not a democracy."

Restrictive Eating Policy, and to orally inform Plaintiff of the terms of the Restrictive Eating Policy.

36. According to Mr. Amman, the terms of the Restrictive Eating Policy were as follows:

(a) Plaintiff was permitted to take one eight-minute break per shift, which could only commence after Plaintiff first located a manager within the restaurant and received permission from that manager to do so.

(b) Plaintiff was permitted to eat ("scarf down," in Mr. Amman's words) only "pre-prepared" food that was brought from outside the restaurant (even though employees were permitted to eat certain restaurant food items, such as bread and butter, salads, and soup, for free). Plaintiff was told that if, for any reason, he did not have pre-prepared food available, he would be sent home and disciplined accordingly (*i.e.*, as a "no show" for his shift).

(c) Plaintiff was permitted to consume his food only while standing in a location in full view of all employees present in the kitchen — a crowded kitchen corner next to the restaurant's old time clock, which was also precariously close to a steep, frequently-used downward staircase.

37. Mr. Amman also explicitly stated to Plaintiff that he was instructed by Mr. Hawley to make it clear that the Restrictive Eating Policy was "non-negotiable."

38. Because of the fast-moving pace of restaurants in general, and MBFG in particular, and because MBFG food servers have a significant number of demands placed upon them at any given time throughout their entirety of their shifts, the Restrictive Eating Policy was virtually useless to Plaintiff, and as such, was utterly unresponsive to his medical issues and needs.

39.     For example, because of the fact that managers are constantly moving throughout different areas of the restaurant, which has multiple floors and is very large in size, locating a manager could frequently be a difficult and time-consuming task, and it had, in fact, frequently utilized the entirety of the brief period of time that Plaintiff was able to find to eat pursuant to the Restrictive Eating Policy's other terms.

40.     The Restrictive Eating Policy was grossly inflexible.  It had no exceptions, nor did it account for contingencies of any kind, which ignored the busy and unpredictable nature of each individual shift — and, more importantly, the unpredictable nature of the uncomfortable and permanent side effects with which Plaintiff was attempting to cope.  To elaborate:

(a)     If Plaintiff felt a need to eat something (because his blood sugar level dropped too low) multiple times during one shift (which was common, particularly during the longer weekend shifts), the Restrictive Eating Policy prohibited Plaintiff from doing so.  This caused him to have to choose between either (1) incurring disciplinary action, including termination, for eating in violation of the Policy, or (2) risking a hypoglycemic episode that could very rapidly cause symptoms including (to name just a few) nausea, weakness, dizziness, vomiting, abdominal pain, impaired motor skills and coordination, confusion, acute irritability, daydreaming, and loss of consciousness.

(b)     Sometimes, Plaintiff would feel hungry enough to eat, though he would only be able to ingest a tiny amount of food (such as a piece of bread).  This same kind of hunger, however, would return multiple times over the course of one shift.  The Restrictive Eating Policy actually required Plaintiff to forego capitalizing on these rare episodes of hunger, which was exactly what Dr. Steinbacher had adamantly cautioned him against.  This was a particularly significant problem to Plaintiff, because it was frequently the case that Plaintiff

would no longer be hungry after he finished his shift; thus, he might not have another "window of opportunity" to eat until sometime the next day.

(c) Even on a day that Plaintiff felt able to eat something that would take more than around thirty seconds to finish (such as a small sandwich), the idea that he could afford to be "out of commission" for eight consecutive minutes on an eating break is completely unrealistic at MBFG — especially during the peak hours of just about any evening shift. When Plaintiff was busy, he would not feel comfortable abandoning his duties for even a fraction of eight minutes, for fear of falling too far behind with his tables. At MBFG, the only way Plaintiff could responsibly deal with this kind of situation without compromising his service to his guests would be to take a few bites of his food, wash his hands, return to the dining room to appropriately care for his guests, go back into to the kitchen and take another few bites, and so on, until he had finished eating. Under the terms of the Restrictive Eating Policy, however, Plaintiff would (assuming that he could even locate a manager quickly enough to get permission to take the break) only be able to take the first few bites of his food; he would not be permitted to eat any more of it once he left the kitchen to attend to (or merely check on) his guests. Plaintiff knew that it could be thirty seconds before he could get another chance to return to the kitchen and continue eating, but it could also be ten or fifteen minutes. The Restrictive Eating Policy was, therefore, completely incompatible with the reality of being a Food Server at MBFG, and Mr. Hawley knew that this would be the case.

41. The Restrictive Eating Policy was an unreasonable accommodation, and was known or should have been known by defendant to be unreasonable from the time of its creation. It worked against Plaintiff's ability to eat adequately, preserve his health and well-being, and perform his job duties in a consistently satisfactory manner.

42.     Even while Plaintiff was attempting in good faith to follow the Restrictive Eating Policy, defendant's management nonetheless conspired to discourage or prevent Plaintiff from doing so.

43.     For instance, on numerous occasions, members of defendant's management would make known to Plaintiff, either verbally or nonverbally, their disapproval when Plaintiff requested his eating break.

44.     In addition, on multiple occasions, members of defendant's management team would suddenly and arbitrarily impose even more restrictive and impractical conditions upon Plaintiff, such as requiring that he also locate and inform a *second* manager prior to taking his break.

45.     On or around February 13, 2006, Plaintiff was summoned to a meeting at which Ms. Nieman, Mr. Amman, and Assistant Manager Brian DiGianvincenzo were present.

46.     At this meeting, Plaintiff was disciplined for allegedly violating the Restrictive Eating Policy, and was informed that he would be terminated should it happen again.  Plaintiff then attempted to communicate the unreasonable nature of the Policy, specifically because the reality of MBFG's daily operations prevented him from utilizing it either in part or in whole.

47.     Mr. Amman made the defendant's discriminatory motives eminently clear when he responded to Plaintiff's concerns by stating to Plaintiff, "We need healthy people here.  If you can't meet that requirement, you need to make a decision [about continuing your employment]."

48.     On or around February 15, 2006, in an attempt to address and remedy defendant's discriminatory conduct and protect his employment status, Plaintiff approached the PHRC about filing a charge of discrimination.

49. Plaintiff submitted his completed PHRC intake questionnaires to the PHRC on or around February 16, 2006.

50. Plaintiff also provided prompt notice to defendant of his decision to pursue formal charges of discrimination in a letter to defendant dated February 17, 2006.  (A true and correct copy of this letter is annexed hereto as Exhibit E.)

51. In this letter, Plaintiff informed defendant that he was filing such charges in order to "protect [his] employment status, prevent further disciplinary action and/or retaliatory conduct regarding this matter, and preserve any rights [he] may possess."

52. On May 4, 2006, defendant was officially served with Plaintiff's PHRC Complaint, which was dual-filed with the EEOC.

53. As a result of Plaintiff's request for a reasonable accommodation due to his disability and any and all subsequent actions taken by Plaintiff in furtherance of his rights under federal and state law (including, but not limited to, filing charges of discrimination with the PHRC and EEOC), defendant intentionally retaliated against Plaintiff by subjecting him to a pattern of constant differential and highly unfavorable treatment vis-à-vis other, similarly situated employees.  For instance:

(a) Defendant refused to promote Plaintiff to the position of Trainer, but promoted others to this position that were less senior and less qualified than Plaintiff.

(b) Plaintiff was issued a written warning (known at MBFG as a "write-up") for a "guest complaint," which Plaintiff had never before received from any guest.  However, the manager who issued the write-up admitted to Plaintiff that the guest had actually only commented that Plaintiff had "appeared nervous."  (This could easily have been caused by Plaintiff's inability to maintain his blood sugar level due to the Restrictive Eating Policy, but in

any event is clearly not an instance of anything that could reasonably be considered a guest *complaint*.)

    (c) Plaintiff was issued another written warning for a guest complaint because defendant claimed a guest was upset that his wife did not receive a candle on her dessert for her birthday.  Defendant stated to Plaintiff that MBFG's Birthday Policy is that a birthday or anniversary dessert must always be served with a lit candle.  Plaintiff, however, had never before been told any such thing by any manager.  In addition, MBFG's written Birthday Policy, of which Plaintiff had long been aware, provides only that a guest is entitled to a complimentary dessert if celebrating a birthday or anniversary; it mentions nothing at all about candles.

    (d) Plaintiff was suspended for three shifts for failing to telephone MBFG during the specified time frame for an "on call" shift.  However, MBFG frequently ignores this kind of infraction if a server who is designated as "on call" for a given evening fails to call in but the error was "harmless" because (s)he was not being required to come in and work that evening.

    (e) On December 31, 2006, defendant demanded that Plaintiff sign a document called a "Last Chance Agreement," which stated that if Plaintiff committed any violation of MBFG policy, he would be terminated.  However, for every other employee ever asked by defendant to sign such a document, they had already been terminated and were thereafter being given one more chance if they wanted to regain their job.  Plaintiff, on the other hand, was still within all of the acceptable limits for tardiness and unexcused absences and was not otherwise subject to termination for any specific reason under MBFG Policy when he was presented with, and forced to sign, his Last Chance Agreement.  Approximately one month later, on January 28, 2007, Plaintiff was approximately one-and-a-half hours late for his shift due to medical reasons beyond his control.  Even though Dr. Steinbacher presented defendant with a

detailed letter explaining specifically what had happened — which, according to Ms. Nieman, would otherwise have excused the absence — Plaintiff was informed that the existence of Last Chance Agreement meant that defendant "had no choice" but to terminate Plaintiff.  (Notably, this is not even what the Last Chance Agreement actually says; it addresses only unexcused absences, not absences which would be excused for medical reasons.)

54.     On January 30, 2007, after months of the aforementioned pattern of discriminatory and retaliatory actions and conduct by defendant, Plaintiff's employment was terminated.

## V.     CAUSES OF ACTION

### COUNT I

### AMERICANS WITH DISABILITIES ACT, 42 U.S.C. §§ 12101 *et seq.* (DISCRIMINATION BASED ON DISABILITY)

55.     Plaintiff incorporates by reference all allegations contained in Paragraphs 1 through 54 inclusive, as though they were set forth more fully at length herein.

56.     Defendant violated the ADA on a continuing basis by failing to adequately and reasonably accommodate Plaintiff's disability.

57.     Defendant violated the ADA by failing to participate in good faith in the "interactive process" with Plaintiff.

58.     Defendant violated the ADA by terminating Plaintiff's employment on account of his disability.

59.     The reasons given by defendant for the termination of Plaintiff's employment were pretextual on account of his disability.

60.     Defendant was motivated, all or in part, by Plaintiff's disability in making its decision to terminate him.

61. Defendant terminated Plaintiff's employment on account of his seeking an accommodation for his disability.

62. After requesting an accommodation, Plaintiff was treated less favorably by defendant than other, non-disabled employees similarly situated to him.

63. As a direct and proximate result of defendant's actions toward Plaintiff, as described herein, Plaintiff has suffered, and will continue to suffer, severe emotional distress, anxiety, depression and other consequential damages.

64. The actions taken by defendant as described herein were willful, deliberate, intentional, and outrageous, and were performed with an extreme indifference to the rights of Plaintiff such that an award of punitive damages is warranted.

## COUNT II

### AMERICANS WITH DISABILITIES ACT, 42 U.S.C. §§ 12101 *et seq.* (RETALIATION FOR REQUESTING REASONABLE ACCOMMODATION)

65. Plaintiff incorporates by reference all allegations contained in Paragraphs 1 through 64 inclusive, as though they were set forth more fully at length herein.

66. As a result of Plaintiff's request for a reasonable accommodation due to his disability and any and all subsequent actions taken by Plaintiff in furtherance of his rights under federal and state law (including, but not limited to, filing charges of discrimination with the PHRC and EEOC), defendant intentionally retaliated against Plaintiff by subjecting him to a pattern of constant differential and highly unfavorable treatment vis-à-vis other, similarly situated employees.

67. Defendant's retaliatory conduct toward Plaintiff violated the ADA.

68.     As a direct and proximate result of defendant's actions, Plaintiff has suffered, and will continue to suffer, severe emotional distress, anxiety, depression and other consequential damages.

69.     The actions taken by defendant were willful, deliberate, intentional, and outrageous, and were performed with an extreme indifference to the rights of Plaintiff such that an award of punitive damages is warranted.

## COUNT III

### PENNSYLVANIA HUMAN RELATIONS ACT, 43 Pa. Cons. Stat. §§ 951 *et seq.* (DISCRIMINATION BASED ON DISABILITY)

70.     Plaintiff incorporates by reference all allegations contained in Paragraphs 1 through 69 inclusive, as though they were set forth more fully at length herein.

71.     Defendant violated the PHRA on a continuing basis by failing to adequately and reasonably accommodate Plaintiff's disability.

72.     Defendant violated the PHRA by terminating Plaintiff's employment on account of his disability.

73.     The reasons given by defendant for the termination of Plaintiff's employment were pretextual on account of his disability.

74.     Defendant was motivated, all or in part, by Plaintiff's disability in making its decision to terminate him.

75.     Defendant terminated Plaintiff's employment on account of his seeking an accommodation for his disability.

76.     After requesting an accommodation, Plaintiff was treated less favorably by defendant than other, non-disabled employees similarly situated to him.

77. As a direct and proximate result of defendant's actions toward Plaintiff, as described herein, Plaintiff has suffered, and will continue to suffer, severe emotional distress, anxiety, depression and other consequential damages.

78. The actions taken by defendant as described herein were willful, deliberate, intentional, and outrageous, and were performed with an extreme indifference to the rights of Plaintiff such that an award of punitive damages is warranted.

## COUNT IV

### PENNSYLVANIA HUMAN RELATIONS ACT, 43 Pa. Cons. Stat. §§ 951 *et seq.* (RETALIATION FOR REQUESTING REASONABLE ACCOMMODATION)

79. Plaintiff incorporates by reference all allegations contained in Paragraphs 1 through 78 inclusive, as though they were set forth more fully at length herein.

80. As a result of Plaintiff's request for a reasonable accommodation due to his disability and any and all subsequent actions taken by Plaintiff in furtherance of his rights under federal and state law (including, but not limited to, filing charges of discrimination with the PHRC and EEOC), defendant intentionally retaliated against Plaintiff by subjecting him to a pattern of constant differential and highly unfavorable treatment vis-à-vis other, similarly situated employees.

81. Defendant's retaliatory conduct toward Plaintiff violated the PHRA.

82. As a direct and proximate result of defendant's actions, Plaintiff has suffered, and will continue to suffer, severe emotional distress, anxiety, depression and other consequential damages.

83. The actions taken by defendant were willful, deliberate, intentional, and outrageous, and were performed with an extreme indifference to the rights of Plaintiff such that an award of punitive damages is warranted.

## VI.     RELIEF REQUESTED

84.     WHEREFORE, Plaintiff respectfully requests judgment in his favor and against defendant, and an award granting him relief including, but not necessarily limited to, the following:

        (a)     compensatory and punitive damages;

        (b)     any equitable remedy that the Court considers appropriate under the circumstances, including, without limitation, reinstatement of Plaintiff's employment;

        (c)     costs, disbursements, and reasonable attorney's fees, should an attorney appear on Plaintiff's behalf during the pendency of this action; and

        (d)     any other and further relief that the Court deems just and proper.

Respectfully submitted,

s/ Daniel J. Nusbaum
_____
Daniel J. Nusbaum
329 Highland Road
Pittsburgh, Pennsylvania 15235
(917) 567-3168

*Pro Se* Plaintiff

Dated: May 4, 2009

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the foregoing Third Amended Complaint was electronically served on counsel for the defendant via this Court's CM/ECF system at the address listed below on the 4th day of May, 2009.

>Christina I. Kepplinger, Esq.
>ckepplinger@eckertseamans.com
>James H. Norris, Esq.
>jnorris@eckertseamans.com
>Eckert Seamans Cherin & Mellott, LLC
>U.S. Steel Tower
>600 Grant Street, 44th Floor
>Pittsburgh, Pennsylvania 15219

>s/ Daniel J. Nusbaum
>_____
>Daniel J. Nusbaum
>*Pro Se* Plaintiff